GROTHGAR v. LEWIS.

(Circuit Court of Appeals, Fifth Circuit. February 28, 1900.)

No. 857.

1. SHERIFFS—WRONGFUL LEVY—DISMANTLING SHIP.
   A schooner injured in a storm during a voyage unloaded her cargo, and went into a shipyard for repairs, and while there was further injured by another storm, which drove her on the shore in the yards. While so lying, defendant, as sheriff, entered upon her, cut off her spars, tore down her rigging, and removed the same, together with her furniture, for the purpose of levying a writ of attachment upon the parts so removed. *Held* that, so long as the ship remained in a condition to be repaired, she was an entirety, consisting of her hull, tackle, apparel, and furniture, and the acts of the defendant in dismantling her constituted an unjustifiable trespass.

2. SAME—ACTION FOR TRESPASS.
   In an action to recover damages for such trespass, where there was evidence tending to show that the ship could have been repaired at a reasonable cost, such question was one for the jury.

In Error to the Circuit Court of the United States for the Southern District of Mississippi.

This action was commenced with the following declaration:

John Grothgar, of the city of Galveston, a citizen of the state of Texas, plaintiff, complains against Frank H. Lewis, of Scranton, in said district, a

---

citizen of the state of Mississippi, defendant, in a plea of trespass on the case. Whereas, heretofore, to wit, the 20th day of August, A. D. 1893, plaintiff was owner of and possessed of a certain good schooner, called "Fairwind," of seventy-nine tons burden, together with all her masts, spars, booms, sails, anchors, chains, pumps, running rigging, standing rigging, lines, ropes, hawsers, blocks, yawl, apparel, and furniture, of great value, to wit, four thousand five hundred dollars; and plaintiff caused said schooner to be fully victualed, provisioned, and equipped, stanch and strong, to carry a certain cargo of lumber and box shooks from Moss Point, in said state of Mississippi, to San Juan Boutista, in the republic of Mexico, and said schooner arrived at Moss Point aforesaid, and received said cargo, to wit, 72,346 feet (board measure) of lumber and box shooks, to be carried thence to San Juan aforesaid, freight payable on the proper delivery of said cargo at the rate of thirteen dollars per thousand feet (board measure), and on, to wit, August 29, A. D. 1893, said schooner, with said cargo on board thereof, set sail and departed from Moss Point aforesaid, bound to San Juan aforesaid, to earn freight for that voyage, the sum of nine hundred and fifty-two dollars and twenty cents. That afterwards, while said schooner was prosecuting said voyage, to wit, September 6, A. D. 1893, she encountered a violent storm and tempest in the Gulf of Mexico, which split her mainsail and broke her mainmast, and she was sailed back to Moss Point aforesaid, and arrived there with all her said cargo on board thereof, without any damage or injury, excepting only her split mainsail and broken mainmast, all of which damage and injury could and would have been repaired at an expense not exceeding two hundred dollars. That the master of said schooner caused said cargo to be unladen at Moss Point aforesaid, but retained the custody thereof, for the purpose of reloading the same so soon as the necessary repairs to said schooner could be made and completed; and, for the purpose of procuring a new mainmast to be put in place of that which had been broken, he navigated said schooner, with all of her said masts, spars, booms, sails, anchors, chains, pumps, running rigging, standing rigging, lines, ropes, hawsers, blocks, yawl, apparel, and furniture, from Moss Point aforesaid down the Pascagoula river to Scranton aforesaid, and made her fast to a certain place, known as "Frentz's Shipyard," to put into said schooner a new mainmast, and to make her stanch, strong, and seaworthy, to retake her said cargo at Moss Point aforesaid, and to resume her said voyage to San Juan aforesaid, and to earn said freight money, to wit, nine hundred and fifty-two dollars and twenty cents; and said schooner there remained, with all the things above mentioned and described on board thereof (the same being part of said schooner), until, to wit, October 3, A. D. 1893, at which last-mentioned date a great storm and tempest cast said schooner, with all the things above mentioned on board said schooner, ashore on the east bank of the said Pascagoula river; and, after said tempest abated and said waters subsided, she rested easily and safely, with all the things above mentioned on board said schooner (the same being part of said schooner), a short distance from the said waters of said river. Her forefoot rested on one of the ways in said shipyard, and her stern rested a short distance, to wit, ten feet, from the waters of said river, from which place she could and would have been easily and safely lifted and launched into the said Pascagoula river, at an expense not exceeding four hundred dollars. That, in being driven by said tempest on the shore of said Pascagoula river, her rudderstock was broken, and a small part of her port bulwarks, to wit, six feet thereof, were stove in, all of which could and would have been repaired at an expense not exceeding one hundred dollars, and she could and would have been made stanch, strong, and seaworthy, and could and would have been launched into the waters of the said Pascagoula river, at an expense not exceeding the several sums of money above mentioned, amounting in all to the sum of, to wit, six hundred dollars, if plaintiff had not been prevented from repairing and launching said schooner as hereinafter stated and set forth.

That, afterwards, to wit, October 19, A. D. 1893, plaintiff being indebted in the sum of two hundred sixteen dollars and forty-one cents to one C. H. Alley, of Scranton aforesaid, the said C. H. Alley caused a certain writ of attachment to issue out of the circuit court of Jackson county, in said state of Mississippi, against the plaintiff's real and personal estate, to satisfy the said debt, and the

said writ of attachment was then and there delivered to the defendant, as the sheriff of said Jackson county, for him to execute the same according to law; and then and there the plaintiff owned no property, of any kind, name, or nature, within the said county of Jackson, but the said schooner Fairwind, her hull, masts, spars, booms, sails, anchors, chains, pumps, running rigging, standing rigging, lines, ropes, hawsers, blocks, yawl, apparel, and furniture, all being then on board said schooner, forming and constituting the said schooner Fairwind; and the defendant then and there entered upon said schooner, as she lay as aforesaid at said Frentz's Shipyard, to execute said writ of attachment; and then and there it became and was the duty of the defendant so to execute said writ of attachment as not to unnecessarily injure the plaintiff, nor to unnecessarily cause loss or damage to plaintiff. That it was defendant's duty to attach and seize all the hull, masts, spars, booms, sails, anchors, chains, pumps, running rigging, standing rigging, lines, ropes, hawsers, blocks, yawl, apparel, and furniture of said schooner en masse, and to take care of and keep the same together on board said schooner safely and securely, exercising all due and reasonable care and caution to prevent injury to the hull of said schooner, and to all and any of the things above mentioned and described, to answer the said demand of the said C. H. Alley. But defendant, well knowing that if the said schooner's said sails, booms, spars, standing rigging, running rigging, lines, hawsers, ropes, blocks, pumps, anchors, chains, topmasts, jib boom, and dead-eyes were disunited, sundered, detached, and severed and removed from said schooner's hull, the mere severance thereof, and the mere taking out and carrying off the said sails, booms, spars, standing rigging, running rigging, lines, hawsers, ropes, blocks, pumps, anchors, chains, topmasts, jib boom, dead-eyes, apparel, and furniture, would greatly depreciate the value of all the said things above mentioned and described, and cause them to be of little or no value; and the defendant well knew that, offering said things above mentioned for sale at public auction after severing them and carrying them away from said schooner's hull, the price to be obtained for them would be insignificant, and the value thereof would be destroyed and lost to plaintiff; and the defendant also well knew that stripping the hull of said schooner of all her said sails, booms, topmasts, jib boom, running rigging, standing rigging, lines, ropes, hawsers, anchors, chains, blocks, pumps, outfit, and furniture, would so greatly reduce the value of said schooner's hull as to cause said schooner's hull to be of so little value as to prevent plaintiff from obtaining credit or money to repair and launch said hull of said schooner; and notwithstanding defendant well knew the consequences of his acts, and notwithstanding he well knew that he would injure, oppress, and ruin plaintiff, the defendant did on the said 19th day of October, A. D. 1893, enter upon said schooner, and cut and chop off her jib boom, unrig her fore-topmast and main-topmast, cut all ropes that made said booms and spars fast to said schooner's masts, cut and unreeve all her running rigging, standing rigging, pull out all her pumps which had been fastened in said schooner to keep her free from water, unbended and took down all said schooner's sails, to wit, mainsail, main-topsail, foresail, fore-topsail, staysail, jib, jib-topsail, and flying jib, pull down all her halyards, unship all anchors and chains, and put the same (that is to say, everything of every name and nature constituting said schooner's outfit and equipment, including cabin furniture, kitchen utensils, and cooking stove) into wagons, and carried them away from said schooner, against the protest of C. R. Harms, the master of said schooner and plaintiff's agent in that behalf; and then and there the defendant left the said schooner's bare hull at the place where said winds and tempest had cast her, and then and there said hull of said schooner, and the said schooner's sails, booms, topmasts, running rigging, standing rigging, anchors, chains, ropes, hawsers, blocks, lines, apparel, and furniture, above mentioned, became and were wholly lost to plaintiff.

And the plaintiff especially avers that, in pursuance of the power granted by defendant by said circuit court to execute said writ of attachment, the defendant entered upon said schooner, and that eo instanti defendant levied said writ of attachment upon said schooner's topmast, booms, sails, ropes, hawsers, lines, anchors, chains, and pumps, or upon any part thereof, the said

attachment and levy thereof became and was in law a levy upon the said schooner's hull, boats, anchors, chains, sails, spars, booms, tackle, apparel, and furniture, and upon all things appurtenant thereto, en masse, and that possession of said schooner's hull, boats, anchors, chains, topmasts, spars, booms, tackle, apparel, and furniture, and all things appurtenant to said schooner, by virtue of said levy, vested in said defendant; and then and there it became and was the duty of said defendant, as sheriff aforesaid, to watch over, guard, defend, and take care of the said hull, masts, topmasts, booms, boats, anchors, chains, pumps, hawsers, ropes, blocks, running rigging, standing rigging, deadeyes, tackle, apparel, and furniture of said schooner, and all other things appurtenant to said schooner, until plaintiff procured, or failed to procure, as provided by law, the release thereof; and, if plaintiff failed to procure the release thereof as provided by law, then it became and was the duty of defendant, as sheriff aforesaid, to apply to the said circuit court for orders to sell the said schooner, her hull mast, topmasts, booms, boats, anchors, chains, pumps, hawsers, ropes, blocks, running rigging, standing rigging, dead-eyes, tackle, apparel, and furniture of said schooner, and all things appurtenant to said schooner, and to sell the same en masse, and all together, and not separately; but the defendant wholly disregarded and neglected his said duty, and willfully stripped the said hull of the said schooner of everything that could be taken and lifted out of the hull of the said schooner, and carried the same away to some place or places unknown to plaintiff, and defendant neglected to take any care of said hull of said schooner, or to place any person to watch or guard said hull of said schooner, although by taking possession of the schooner and carrying away parts thereof he became responsible for the whole; the seizure and conversion of the schooner being complete when its necessary equipments were appropriated and dissevered from the hull, which could not be dismantled without impairing the value and usefulness of the schooner, rendering the schooner unavailable for the purposes for which schooners are constructed; the fact being that the various parts of vessels, such as the hull, rigging, tackle, sails, and equipment, are so related each to the other that they are capable of being used, and are so valuable only when used, together as a complete vessel. Plaintiff therefore charges that the levy and seizure made by defendant was in fact a trespass upon, and a wrongful appropriation and conversion of, all of said schooner, and as a consequence of such levy and seizure the defendant was legally bound to use ordinary and reasonable care for the safe-keeping and preservation of the entire schooner, her hull, tackle, apparel, and furniture, to the end that no unnecessary damage, loss, or sacrifice might be sustained by plaintiff; but this duty defendant, through neglect and a reckless disregard of plaintiff's rights, failed to perform, in that he allowed the hull of the schooner to remain unguarded and uncared for at the place where she lay when despoiled by him, and he allowed other persons to trespass thereon and to exercise control thereof, all of which was due to defendant's fault and omission of duty, and which fault and omission resulted in the hull of said schooner being entered upon and seized about November 7, A. D. 1893, by one George Frentz, who caused her bow to be sawed and cut off and to be thrown off or to fall in the Pascagoula river, which bow floated away and was wholly lost, and thenceforth what remained of said schooner became and was of no value whatever; and thus said schooner, her tackle, apparel, and furniture, by the misconduct and neglect of defendant as aforesaid, were and are wholly lost to plaintiff, the value thereof being, as stated, four thousand five hundred dollars; and in consequence thereof plaintiff was also prevented from delivering her cargo at said port of destination, and in consequence thereof plaintiff lost all freight money, to wit, nine hundred and fifty-two dollars and twenty cents, and has sustained further loss in being deprived of the use and benefit of said schooner by reason of defendant's acts and unlawful conduct, which were in violation of the law of the land, and all of which caused damage to the plaintiff as aforesaid in the sum of ten thousand dollars. Wherefore plaintiff brings his suit, and prays that the defendant be summoned as the law directs, and that plaintiff have judgment for the said sum of ten thousand dollars and all costs.

July 28, 1897.                                    O. B. Sansum, Plaintiff's Attorney.

After the foregoing declaration, the defendant pleaded the general issue, with notice that thereunder he would prove the following facts in defense of the plaintiff's demand:

That the said schooner Fairwind, at the time of the levy by defendant upon the rigging, sails, and appliances levied upon the writ of attachment in the case of O. H. Alley v. John Grothgar, was lying upon the shore at Frentz's Shipyard, a hopeless wreck. That said vessel at said time was not worth repairing, on account of her great age, and the dilapidated condition in which the storm referred to in the declaration had left her, and that the only thing of value in or about said vessel was the rigging, sails, furniture, and apparel levied upon by defendant under said attachment writ. Said plaintiff, the owner of said vessel, had abandoned her in her wrecked condition. And that said Geo. Frentz, the owner of the ground on which she lay, was demanding that she be immediately moved, and threatening to cut up said vessel if not removed. That defendant, acting under instructions from C. H. Alley, plaintiff in said attachment suit, levied only upon such articles as could be removed and had some value, and that the hull of said vessel was never levied upon at all, but was left in the possession and control of the master of the vessel. That if said vessel had been sold in the condition she was in when affiant levied said attachment writ on said rigging, etc., she would not have brought the value of said articles seized by defendant, as the purchaser would have been charged with the cost of keeping said vessel, and that said Frentz repeatedly notified said plaintiff to remove said vessel from his shipyard, but that plaintiff, well knowing that he had abandoned said vessel and that she was not worth repairing, let said Frentz cut her to pieces. That said plaintiff was aware at the time this suit was brought of all the above facts, and that said suit is a fraud upon this court, and being prosecuted for malicious purposes, and not with any hope of recovery.

On these pleadings the case was tried before the court and a jury. At the close of the evidence the trial judge ex propria directed a verdict for the defendant, and the plaintiff sued out this writ of error.

O. B. Sansum, for plaintiff in error.
J. I. Ford, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts as above). The evidence submitted by the plaintiff on the trial tended to prove the truth of every material allegation in the declaration, and this evidence on many facts was practically undisputed. The question to which the evidence of the defendant was mainly directed was whether the schooner Fairwind, as she lay at Frentz's Shipyard, was worth repairing, and could have been repaired, or had practically ceased to be a ship, and was a mere hulk, good for nothing but to break up. A ship engaged in navigation is an entirety, and usually described as consisting of the ship, her tackle, apparel, and furniture; and this includes the hull and spars, which constitute the ship, the rigging, which constitutes the tackle, the sails, which are her apparel, and the anchors and numerous utensils for the ship's use, which are the ship's furniture. See Ben. Adm. § 222; Bouv. Law Dict. verb. "Ship"; 1 Pars. Shipp. & Adm. 78; 22 Am. & Eng. Enc. Law, 741. If, as there was evidence tending to show, the Fairwind while proceeding on her voyage had met with disaster, had unloaded her cargo for the purpose of repairing, and was in a condition to be repaired, then she was still a ship, and, with her hull, tackle, apparel, and furniture, constituted an entirety; and to enter upon

a ship, and cut off her spars and tear down her rigging, for the pur-
pose of levying an execution on the result as property separate
from the ship, was as serious violation of duty as it would be for a
constable to tear down the chimney of a dwelling house in order
to levy an execution upon the bricks, or to cut off the axles of a
locomotive, so as to make the wheels separate property, subject to a
levy. The court erred in not submitting the questions involved to
the jury. The judgment of the circuit court is reversed, and the
cause is remanded, with instructions to grant a new trial, and there-
after proceed in conformity with the views herein expressed, and
according to law.